UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SCOTT ALLEN MCCURRY, | No.  1:22-cv-01398-ADA-SKO (HC) |
| Petitioner, | **FINDINGS AND RECOMMENDATION TO DENY PETITION FOR WRIT OF HABEAS CORPUS** |
| v. | |
| KATHLEEN ALLISON, CDCR Secretary, | **[THIRTY DAY OBJECTION DEADLINE]** |
| Respondent. | |

Petitioner is a state prisoner proceeding *pro se* and *in forma pauperis* with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  This matter was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 302.

On October 31, 2022, Petitioner filed the instant habeas petition challenging Stanislaus County Superior Court convictions of torture, corporal injury to a cohabitant, assault, and battery. As discussed below, the Court finds the claims to be without merit and recommends the petition be **DENIED.**

**I.      PROCEDURAL HISTORY**

On August 25, 2017, Petitioner was convicted by jury trial in the Stanislaus County Superior Court of two felonies: torture in violation of Cal. Penal Code § 206, and corporal injury

1

1   to a spouse/cohabitant in violation of Cal. Penal Code § 273.5(a). (Doc. 11-23 at 2.[1])  As to both

2   felony counts, the jury found true a prior serious conviction enhancement (Cal. Penal Code §

3   667(a)) and prior strike conviction, and an enhancement for great bodily injury (Cal. Penal Code

4   § 12022.7).  (Doc. 11-23 at 2.)  The jury also found true four misdemeanors: two counts of assault

5   in violation of Cal. Penal Code § 240, and two counts of battery in violation of Cal. Penal Code §

6   242.  (Doc. 11-23 at 2.)  On December 11, 2017, the sentencing court granted Petitioner's request

7   to strike the prior conviction pursuant to Cal. Penal Code § 1385.  (Doc. 11-23 at 2.)  Petitioner

8   was sentenced to 7 years-to-life in prison with possibility of parole on the torture count and a

9   consecutive five-year term for the § 667(a) prior serious felony enhancement, for a total stated

10   term of 12 years-to-life.  (Doc. 11-23 at 2-3.)  Petitioner was also sentenced to concurrent terms

11   of eight years on the corporal injury count and 180 days on the four misdemeanor counts.  (Doc.

12   11-23 at 3.)

13        On December 12, 2017, Petitioner appealed to the California Court of Appeal, Fifth

14   Appellate District ("Fifth DCA"). (Doc. 11-23 at 3.)  Petitioner argued the sentencing court

15   imposed an unauthorized sentence for the count of torture, because it aggregated the minimum

16   parole ineligibility period of 7 years with the life sentence and characterized it as the minimum

17   sentence.  He also contended the matter must be remanded because of the subsequent enactment

18   of Cal. Senate Bill No. 1393 (2017–2018 Reg. Sess.), which gave discretion to the sentencing

19   court to dismiss the section 667(a) prior serious felony conviction enhancement.  (Doc. 11-23 at

20   3.)

21        On May 9, 2019, the appellate court held the trial court did not commit error when it

22   described the minimum parole ineligibility period of seven years as the minimum prison term and

23   added the five-year term for the prior serious felony enhancement to that seven-year minimum

24   term, for a total term of 12 years to life.  (Doc. 11-15.)  On May 23, 2019, the appellate court

25   modified its opinion, agreeing that the matter should be remanded because Senate Bill 1393

26   amended § 667(a) after the sentencing hearing to give the sentencing court discretion to

27

28   [1] Docket citations refer to ECF pagination.

1    determine whether to dismiss the consecutive term of five years that it imposed for that

2    enhancement.  (Doc. 11-16 at 1-2.)

3            On November 13, 2019, Petitioner filed a petition for writ of habeas corpus in the

4    Stanislaus County Superior Court. (Doc. 11-25 at 3-71.)  On December 11, 2019, the court denied

5    the claim in a reasoned decision. (Doc. 11-25 at 1-3.)

6            On March 25, 2020, Petitioner filed a petition for writ of habeas corpus in the Fifth DCA.

7    (Doc. 11-26 at 2-169.)  The petition was denied without comment or citation to authority on April

8    29, 2020. (Doc. 11-26 at 1.)

9            On May 8, 2020, Petitioner filed a habeas petition in the California Supreme Court. (Doc.

10   11-27 at 2-175.)  The petition was summarily denied on July 22, 2020. (Doc. 11-27 at 1.) On

11   October 1, 2021, Petitioner filed a second habeas petition in the California Supreme Court. (Doc.

12   11-28 at 2-99.)  On December 15, 2021, the petition was summarily denied. (Doc. 11-28 at 1.)

13           On January 10, 2022, Petitioner commenced another round of collateral review by filing a

14   habeas petition in the Stanislaus County Superior Court.  (Doc. 11-29 at 8-101.)  On February 28,

15   2022, the court denied the petition in a reasoned decision. (Doc. 11-29 at 1-7.)  Petitioner then

16   filed a habeas petition in the appellate court on March 18, 2022. (Doc. 11-30 at 2-112.)  The

17   petition was summarily denied on May 12, 2022. (Doc. 11-30 at 1.)  On May 27, 2022, Petitioner

18   filed a habeas petition in the California Supreme Court. (Doc. 11-31 at 2-120.)  On September 14,

19   2022, the California Supreme Court denied the petition as procedurally barred, citing In re Clark,

20   5 Cal.4th 750, 767-69 (1993) ("courts will not entertain habeas corpus claims that are

21   successive") and In re Miller, 17 Cal.2d 734, 735 (1941) ("courts will not entertain habeas corpus

22   claims that are repetitive"). (Doc. 11-31 at 1.)

23           On October 31, 2022, Petitioner filed the instant habeas petition in this Court.  (Doc. 1.)

24   On January 3, 2023, Respondent filed an answer to the petition. (Doc. 12.)  On January 13, 2023,

25   Petitioner filed a traverse to the answer. (Doc. 13.)

26   **II.      FACTUAL BACKGROUND**

27           A.      The incident

28           The victim, JS, testified that she was in a relationship with Petitioner for approximately

3

two years. (Doc. 11-6 at 60.) She had been living in a one-bedroom studio apartment in Modesto with Petitioner for approximately eight months. (Doc. 11-6 at 60-61.) On October 25, 2016, JS decided to end the relationship because of the abuse she had endured. (Doc. 11-6 at 64.) At approximately 1:30 a.m., JS arrived at the apartment to obtain her belongings and move out. (Doc. 11-6 at 64.) JS texted Petitioner, and he later texted back. (Doc. 11-6 at 64-65.) They met at another location, argued, and Petitioner sped off on his motorcycle. (Doc. 11-6 at 65.) JS chased Petitioner to a Taco Bell where they argued some more. (Doc. 11-6 at 65.) Petitioner told JS that he was "going to go see another bitch." (Doc. 11-6 at 65.) JS replied, "That's fine. Not on my motorcycle." (Doc. 11-6 at 65.) Petitioner stated, "If you can ride off on it like I told you, you can have it back." (Doc. 11-6 at 65-66.) JS then reached for the motorcycle to put her leg over it and leave, but Petitioner took the keys and pushed her. (Doc. 11-6 at 66.) Petitioner got back on the motorcycle, and JS told him that she was going to go back to the apartment and collect her belongings. (Doc. 11-6 at 66.)

JS then returned to the apartment, and Petitioner let her in. (Doc. 11-6 at 66.) When JS entered the house, Petitioner punched her in the face. (Doc. 11-6 at 67.) He then told her, "Look at you. I can't let you go nowhere now." (Doc. 11-6 at 67.) JS replied that she was going to get her things and leave. (Doc. 11-6 at 68.) Petitioner told her, "You are not going anywhere," and he blocked her from leaving. (Doc. 11-6 at 68.) Petitioner then told her they were going to have sex. (Doc. 11-6 at 69.) JS told him they were not because she didn't want to do so. (Doc. 11-6 at 69.) Petitioner proceeded to rip JS's clothes off and demanded she take out her dentures and orally copulate him. (Doc. 11-6 at 69.) Petitioner told her that if she did not, "he was going to shove this bat up [her] ass." (Doc. 11-6 at 70.) JS eventually took her dentures out and Petitioner forced her to orally copulate him. (Doc. 11-6 at 70.) JS attempted to resist, but Petitioner got violent and began choking her. (Doc. 11-6 at 71.) He also kneed her in the stomach. (Doc. 11-6 at 71.) Petitioner then demanded that JS sit next to him so he could tell her something. (Doc. 11-6 at 72.) JS refused. (Doc. 11-6 at 72.) Petitioner then told her, "If you go to the cops and you tell the cops, I'll go to jail for about two or three years, and then I will definitely kill you. I may not kill you tonight, but I am going to fuck you up. I'm going to disfigure your face so bad your kids

4

won't even want to be around you." (Doc. 11-6 at 72.)  JS was scared but couldn't leave. (Doc. 11-6 at 72-73.)

JS refused to have intercourse with Petitioner.  (Doc. 11-6 at 74.)  Petitioner proceeded to throw JS on the bed, get on top of her and insert his penis into her anus. (Doc. 11-6 at 74.) During this time, Petitioner also attempted to insert an air freshener can into her anus. (Doc. 11-6 at 75.)  When it would not go in, he placed his penis back in JS's anus and then inserted the air freshener can into her vagina. (Doc. 11-6 at 74-75.)  JS tried to get Petitioner to stop, stating, "No. No. You don't have [to] do this. Why are you doing this? Take it out. Take it out." (Doc. 11-6 at 74.)  Also during the time, Petitioner struck JS with a closed fist over twenty times in the arms, kidneys, and stomach. (Doc. 11-6 at 78.)  JS stated Petitioner also "kicked me in my ass one time." (Doc. 11-6 at 78.)  Petitioner eventually ejaculated. (Doc. 11-6 at 77.)  JS then got up and told Petitioner she needed to use the bathroom because she had involuntarily defecated. (Doc. 11-6 at 77.)

In the bathroom, JS wiped herself with a towel and saw that she was bleeding from the rectum. (Doc. 11-6 at 78.)  Petitioner then came into the bathroom with a lit torch. (Doc. 11-6 at 79.)  Petitioner put the torch "on full blast and told me he was going to melt my face off." (Doc. 11-6 at 79.)  JS attempted to stop him but Petitioner burned her on her left hip.  (Doc. 11-6 at 79.) Petitioner kept attempting to burn JS but she was able to extinguish the flame with a cup several times. (Doc. 11-6 at 79.)  Petitioner stated, "Come on, I'm getting tired. I just want to get this done and over with. Because it's going to happen tonight. I'm going to fuck you up." (Doc. 11-6 at 79-80.)  The burn JS received to her left hip left a permanent scar. (Doc. 11-6 at 80.)

After the incident with the torch, JS asked if she could get a drink of water because she was out of breath and thirsty, and Petitioner allowed her to do so.  (Doc. 11-6 at 82.)  Petitioner then started hitting her in the head, punching her in the face four times.  (Doc. 11-6 at 82.)  JS eventually became confused and dazed and asked if Petitioner could stop and let her lay down and rest for a bit, which Petitioner did. (Doc. 11-6 at 82.)  JS laid down on the bed for a while. (Doc. 11-6 at 83.)

JS eventually got up and went to the bathroom to smoke a cigarette. (Doc. 11-6 at 83.)

5

Petitioner followed her in and grabbed her by the throat, wrestled her to the floor, and choked her

again.  (Doc. 11-6 at 83.)  JS fought back by grabbing at his bottom jaw. (Doc. 11-6 at 83.)

Petitioner said, "You ripped my teeth out, you stupid bitch." (Doc. 11-6 at 83.)  JS stated he

continued to choke her with one hand and she could not breathe. (Doc. 11-6 at 84.)  Petitioner

then got up and told her, "Man, you are so stupid, you don't even try to get out. What the hell's

wrong with you? You know I'm going to kill you, right?" (Doc. 11-6 at 84.)  JS attempted to

assuage him by telling him she loved him and that she would not call the police. (Doc. 11-6 at

84.)

Later, Petitioner went to the bathroom and JS attempted to escape through the front door.

(Doc. 11-6 at 84-85.)  Petitioner caught her at the front door and wrestled her to the ground on a

piece of plywood. (Doc. 11-6 at 85.)  Petitioner then thrust a glass methamphetamine pipe into

her forehead. (Doc. 11-6 at 85.)  JS sustained a cut on her head from the glass pipe.  Petitioner

then got off of JS and let her go. (Doc. 11-6 at 85.)  It was daylight outside, and JS went home.

(Doc. 11-6 at 86.)  At approximately 2:00-2:30 p.m. that afternoon, JS's cousin took her to the

hospital where she was treated for her injuries. (Doc. 11-6 at 86.)

### B.    Prior Relationship History

The prosecutor then went over JS's prior relevant sexual history with Petitioner. (Doc. 11-6 at 99.)  JS stated that while Petitioner had spanked her on her rear during sexual intercourse in

the past, he had never before punched her during sexual intercourse. (Doc. 11-6 at 99.)  He had

never before used a torch or any other item to inflict burns on JS. (Doc. 11-6 at 100.)  Prior to the

incident, at no point had Petitioner ever inserted a foreign object into her. (Doc. 11-6 at 100.)

And, at no point during the incident had JS ever told Petitioner it was okay to do any of these acts

to her. (Doc. 11-6 at 100.)

### C.    Cross-Examination of JS

During cross-examination, JS admitted to going to the apartment the day before the

incident, but not taking any of her belongings. (Doc. 11-6 at 102.)  She also smoked

methamphetamine prior to going to the apartment. (Doc. 11-6 at 101.)  JS's account of the details

prior to the incident and the facts of the incident varied in several significant details.  At the

1    preliminary hearing, JS did not state that Petitioner had kneed her in the stomach. (Doc. 11-6 at

2    106.)  At the preliminary hearing, JS stated she removed her shirt and pants herself. (Doc. 11-6 at

3    110-111.)  JS also stated that after oral sex, Petitioner had told her, "You are beautiful. Don't let

4    anybody ever tell you you are not."  (Doc. 11-6 at 111.)  On cross-examination, JS also admitted

5    that she had taken a nap, and that when she awoke, Petitioner was crying and told her to leave.

6    (Doc. 11-6 at 111.)  JS also admitted that in 2010, she was convicted of felony infliction of

7    potentially great bodily injury to a child. (Doc. 11-6 at 114.)

8           D.     Petitioner's Statement to Police

9         Petitioner was interviewed by police concerning the incident.  (Doc. 11-2 at 11.)

10   Petitioner admitted that JS had upset him and so he "smacked her." (Doc. 11-2 at 13.)  However,

11   Petitioner stated their relationship was based on "rough sex." (Doc. 11-2 at 16.)  Petitioner

12   admitted he had assaulted JS, and he had hit JS all over her body over a long period of time. (Doc.

13   11-2 at 19-20.)  Petitioner also admitted that he used a blow torch on JS, stating, "Yeah I – I burnt

14   [sic] her. My – my bad." (Doc. 11-2 at 38.)  He stated that he "was fucking with her." (Doc. 11-2

15   at 38.)  When the investigator remarked that there's a difference between pleasure and getting

16   burned, Petitioner responded, "You'd be surprised. You would be surprised." (Doc. 11-2 at 39.)

17          E.     Defense Argument

18        The defense theory in this case was characterized as "[r]evenge and exaggeration."  (Doc.

19   11-6 at 250.)  Defense counsel did not dispute that Petitioner caused the injuries sustained by JS;

20   however, counsel argued it was consistent with an abusive relationship. (Doc. 11-6 at 251.)

21   Defense counsel argued that Petitioner did inflict injuries on JS, but that JS exaggerated the

22   nature of those injuries. (Doc. 11-6 at 253.)  Defense counsel pointed out that JS made numerous

23   inconsistent statements. (Doc. 11-6 at 253-54.)  Counsel noted that JS's trial testimony was

24   different in many respects from her prior statements to medical staff and police, and from her

25   preliminary hearing. (Doc. 11-6 at 253-54.)  Defense counsel further noted that Petitioner

26   accepted responsibility for burning JS, but that it was an accident and he didn't know that he was

27   actually burning her. (Doc. 11-6 at 255-56.)  Defense counsel argued that there was reasonable

28   doubt that JS consented to the actions, and whether JS's account of Petitioner's actions were

1    exaggerated in light of JS's inconsistent statements. (Doc. 11-6 at 256-60.)  Defense counsel

2    contended the acts did not constitute torture, rape or assault, but were acts of unusual but

3    consensual sexual activity. (Doc. 11-6 at 260.)  He summed up the argument stating, "It is true

4    that [JS] was assaulted. It is true that [Petitioner] hit [JS]. But all the other stuff is an

5    exaggeration. He didn't punch her eight times in the face. He didn't torture her. He didn't rape

6    her. He didn't sodomize her. He didn't force her to give him oral sex." (Doc. 11-6 at 260.)

7    **III.   DISCUSSION**

8          A.    Jurisdiction

9          Relief by way of a petition for writ of habeas corpus extends to a person in custody

10   pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or

11   treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor,

12   529 U.S. 362, 375 n. 7 (2000).  Petitioner asserts that he suffered violations of his rights as

13   guaranteed by the United States Constitution.  The challenged conviction arises out of the

14   Stanislaus County Superior Court, which is located within the jurisdiction of this court.  28

15   U.S.C. § 2254(a); 28 U.S.C.§ 2241(d).

16         On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of

17   1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its

18   enactment.  Lindh v. Murphy, 521 U.S. 320 (1997) (holding the AEDPA only applicable to cases

19   filed after statute's enactment).  The instant petition was filed after the enactment of the AEDPA

20   and is therefore governed by its provisions.

21         B.    Legal Standard of Review

22         A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless

23   the petitioner can show that the state court's adjudication of his claim: (1) resulted in a decision

24   that was contrary to, or involved an unreasonable application of, clearly established Federal law,

25   as determined by the Supreme Court of the United States; or (2) resulted in a decision that "was

26   based on an unreasonable determination of the facts in light of the evidence presented in the State

27   court proceeding."  28 U.S.C. § 2254(d); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003);

28   Williams, 529 U.S. at 412-413.

8

A state court decision is "contrary to" clearly established federal law "if it applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set of facts that is materially indistinguishable from a [Supreme Court] decision but reaches a different result." Brown v. Payton, 544 U.S. 133, 141 (2005) (citing Williams, 529 U.S. at 405-406).

In Harrington v. Richter, 562 U.S. 86, 101 (2011), the U.S. Supreme Court explained that an "unreasonable application" of federal law is an objective test that turns on "whether it is possible that fairminded jurists could disagree" that the state court decision meets the standards set forth in the AEDPA. The Supreme Court has "said time and again that 'an unreasonable application of federal law is different from an incorrect application of federal law.'" Cullen v. Pinholster, 563 U.S. 170, 203 (2011). Thus, a state prisoner seeking a writ of habeas corpus from a federal court "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." Harrington, 562 U.S. at 103.

The second prong pertains to state court decisions based on factual findings. Davis v. Woodford, 384 F.3d 628, 637 (9th Cir. 2003) (citing Miller-El v. Cockrell, 537 U.S. 322 (2003)). Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the petitioner's claims "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Wiggins v. Smith, 539 U.S. 510, 520 (2003); Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997). A state court's factual finding is unreasonable when it is "so clearly incorrect that it would not be debatable among reasonable jurists." Jeffries, 114 F.3d at 1500; see Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004), cert.denied, Maddox v. Taylor, 543 U.S. 1038 (2004).

To determine whether habeas relief is available under § 2254(d), the federal court looks to the last reasoned state court decision as the basis of the state court's decision. See Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). "[A]lthough we independently review the record, we still defer to the state court's ultimate decisions." Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

9

1  The prejudicial impact of any constitutional error is assessed by asking whether the error

2  had "a substantial and injurious effect or influence in determining the jury's verdict." <u>Brecht v.</u>

3  <u>Abrahamson</u>, 507 U.S. 619, 623 (1993); <u>see also</u> <u>Fry v. Pliler</u>, 551 U.S. 112, 119-120 (2007)

4  (holding that the <u>Brecht</u> standard applies whether or not the state court recognized the error and

5  reviewed it for harmlessness).

6  In a case where the state court decided the petitioner's claims on the merits but provided

7  no reasoning for its decision, the federal habeas court conducts "an independent review of the

8  record . . . to determine whether the state court [was objectively unreasonable] in its application

9  of controlling federal law." <u>Delgado v. Lewis</u>, 223 F.3d 976, 982 (9th Cir. 2002). "[A]lthough

10  we independently review the record, we still defer to the state court's ultimate decisions." <u>Pirtle</u>

11  <u>v. Morgan</u>, 313 F.3d 1160, 1167 (9th Cir. 2002).

12  C.    Review of Petition

13  Petitioner presents the following grounds for relief[2]: 1) Trial exhibits were destroyed in

14  bad faith by the State, and the prosecution used false evidence in the form of an altered transcript

15  of Petitioner's interview, in violation of Petitioner's constitutional rights; 2) Defense counsel

16  rendered ineffective assistance of counsel in the following ways: by wrongfully withholding the

17  fact that she allowed the exhibits to be destroyed; by failing to ask a single question of the only

18  defense witness; by allowing the State to submit an altered interrogation; by failing to interview

19  any of the witnesses Petitioner asked her to interview, in particular, JS's daughter, who would

20  have testified how vindictive and dishonest JS is, and Petitioner's sister, who would have testified

21  that she had beaten up JS, not Petitioner; and, by failing to object to false evidence that Petitioner

22  burned the victim with a torch, and that Petitioner confessed to the crime; 3) Petitioner's right to

23  effective assistance of appellate counsel was violated when she filed a <u>Wende</u> brief, rather than

24  assert the claims Petitioner asked to present; and 4) The prosecutor committed misconduct by

25  introducing false evidence.

26

27

28
_____

[2] Petitioner has set forth six numbered grounds for relief; however, Grounds Four and Five are restatements and/or supplements of the previous grounds.

1          1.      Ground One

2          In Ground One, Petitioner brings two related claims.  Although Petitioner titles the claim,

3  "Newly Discovered Evidence," the claim actually involves alleged bad faith destruction of

4  evidence by the prosecution and the use of an allegedly falsely altered interrogation transcript.

5  As to the first part of the claim, Petitioner alleges that the State destroyed all of the exhibits from

6  Petitioner's trial to prevent Petitioner from challenging the conviction.  Included among the

7  exhibits were photographs of the victim's burn injuries.  In Ground Five, Petitioner claims the

8  destruction of the photographs was also prejudicial.  Since the claim is mainly an addition to

9  Ground One, the Court will address it.  As to the second part, Petitioner alleges the prosecutor

10 and defense counsel utilized a transcript of Petitioner's interrogation that had been falsely altered

11 from the original so as to favor the prosecution.  In Ground Four, Petitioner expands on this claim

12 by alleging the prosecutor altered the transcript.  The Court will address the subclaims separately,

13 as they involve different legal theories.

14         a.      Destruction of Evidence

15         Petitioner first raised the claim before the California Supreme Court in a habeas petition

16 filed on October 1, 2021. (Doc. 11-28 at 2.)  The California Supreme Court rejected the claim

17 without comment or citation of authority. (Doc. 11-28 at 1.) Petitioner next raised the claim in a

18 habeas petition in the Stanislaus County Superior Court. (Doc. 11-29.)  The claim was denied in a

19 reasoned decision. (Doc. 11-29.)  Petitioner then raised it to the California Court of Appeal in a

20 habeas petition, but the petition was summarily denied without comment. (Doc. 11-30.)  Finally,

21 Petitioner presented the claim again to the California Supreme Court in a habeas petition.  (Doc.

22 11-31.)  The California Supreme Court denied the petition on procedural grounds as repetitive

23 and successive. (Doc. 11-31.)

24         i.      Legal Standard

25         In Arizona v. Youngblood, the Supreme Court held "that unless a criminal defendant can

26 show bad faith on the part of the police, failure to preserve potentially useful evidence does not

27 constitute a denial of due process of law."  488 U.S. 51, 58 (1988).  In California v. Trombetta,

28 the Supreme Court stated: "Whatever duty the Constitution imposes on the States to preserve

evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense.  To meet this standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means."  467 U.S. 479, 488-89 (1984) (citations and footnotes omitted).  In addition, "if, having served [its] purpose, [the evidence was] destroyed by the agents in good faith and in accord with their normal practices, it would be clear that [its] destruction did not constitute an impermissible destruction of evidence nor deprive petitioner of any right."  Killian v. United States, 368 U.S. 231, 242 (1961).  The presence or absence of bad faith turns on the government's knowledge of the apparent exculpatory value of the evidence at the time it was lost or destroyed.  Youngblood, 488 U.S. at 56-57; see also Grisby v. Blodgett, 130 F.3d 365, 371 (9th Cir. 1997); United States v. Barton, 995 F.2d 931, 934 (9th Cir. 1993); United States v. Cooper, 983 F.2d 928, 931 (9th Cir. 1993).

### ii.   Analysis

In rejecting the claim, the Stanislaus County Superior Court noted that Petitioner had not in fact been notified that the exhibits had been destroyed.  (Doc. 11-29 at 4.)  Appellate counsel was instead advised by the District Attorney's office that the photographs had not been scanned into their system and they were looking for the disc containing the photographs.  (Doc. 11-29 at 4.)  Petitioner was advised of this on July 30, 2021, (doc. 11-29 at 4), but by this time, the time to file an appeal concerning the exhibits had already expired. (Doc. 11-29 at 4.)  The court further noted that the claim could have been, but was not raised on direct appeal.  Citing to In re Waltreus, 52 Cal.2d 218, 225 (1965) and In re Dixon, 41 Cal.2d 756, 759 (1953), the court determined that Petitioner was procedurally barred from raising the claim.

The claim fails for several reasons.  First, there is no evidence that the prosecution destroyed evidence.  According to the exhibits, the documents were destroyed by a law office that had provided photographs contained on a disc from the District Attorney's office. (Doc. 11-29 at 96.)  Therefore, any constitutional authority requiring the prosecution to preserve evidence is inapplicable.  Likewise, Petitioner cannot demonstrate bad faith on the part of the government,

12

1  since it was not the prosecution that allegedly destroyed evidence.  Accordingly, Petitioner fails

2  to show that his due process rights were violated.

3        Petitioner submits exhibits which purport to show that the trial court destroyed its copies

4  of exhibits on January 8, 2020.  (Doc. 1 at 128-133.)  This was done by the trial court following

5  conclusion of direct appeal, not by the prosecution, and it was done in accord with normal

6  procedures. In any event, Petitioner fails to show that the photographs, or any other exhibit for

7  that matter, were exculpatory, or that their alleged destruction was prejudicial.

8        The photograph of the burn from the torch was published to the jury as People's Exhibit

9  28.  (Doc. 11-6 at 97.)  The victim described the injuries depicted in the photograph as, "That's

10  the burn mark on my left thigh from the torch." (Doc. 11-6 at 97.)  The victim was then asked to

11  show the scar resulting from the burn to the jury in person; when she did so, the prosecutor noted

12  for the record that the victim "is pointing to a red kind of crescent-curved mark on her left thigh,"

13  to which the court stated, "Yes." (Doc. 11-6 at 97.)  Petitioner's assertion that the photograph

14  revealed no injury is therefore frivolous.  Had there in fact been no burn injury, this would have

15  been apparent to both the judge and jury.  Thus, Petitioner's claim that the photographs would

16  have aided him subsequent to the appeal is speculative and unfounded.  Petitioner also contends

17  other exhibits were also destroyed, but fails to state how he was prejudiced by the destruction of

18  these other unidentified exhibits.  The claim therefore fails.

19                      **b.**      **Altered Transcript**

20        In the second part of the claim, Petitioner alleges the prosecutor used an altered transcript

21  of the interrogation which contained false statements made by Petitioner that incriminated him.

22  He further faults defense counsel for failing to challenge the altered transcript at trial.

23        Petitioner also first raised the claim in a habeas petition to the California Supreme Court

24  on October 1, 2021. (Doc. 11-28 at 2.)  The petition was summarily denied.  (Doc. 11-28 at 1.)

25  Petitioner next raised the claim in a habeas petition in the Stanislaus County Superior Court.

26  (Doc. 11-29.)  The claim was denied on procedural grounds; specifically, the claim was barred

27  pursuant to In re Waltreus, 52 Cal.2d 218, 225 (1965), In re Dixon, 41 Cal.2d 756, 758 (1953), In

28  re Harris, 5 Cal.3d 813, 829 (1993), In re Clark, 5 Cal.4th 750, 770 (1993), and In re Terry, 4

1   Cal.3d 911, 927 (1971), because it could have been raised on direct appeal.  (Doc. 11-29.)

2   Petitioner then raised it to the California Court of Appeal in a habeas petition, where it was

3   summarily denied. (Doc. 11-30.)  Finally, Petitioner presented the claim again to the California

4   Supreme Court in a habeas petition.  (Doc. 11-31.)  The California Supreme Court denied the

5   petition on procedural grounds as repetitive and successive. (Doc. 11-31.)

6                                i.      Legal Standard

7        Due process requires that the prosecution disclose exculpatory evidence within its

8   possession. Brady v. Maryland, 373 U.S. 83, 87 (1963); Cooper v. Brown, 510 F.3d 870, 924 (9th

9   Cir. 2007). There are three components of a Brady violation: "[t]he evidence at issue must be

10  favorable to the accused, either because it is exculpatory, or because it is impeaching; the

11  evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice

12  must have ensued." Strickler v. Greene, 527 U.S. 263, 281-82 (1999); see also Banks v. Dretke,

13  540 U.S. 668, 691 (2004); Silva v. Brown, 416 F.3d 980, 985 (9th Cir. 2005).

14                               ii.      Analysis

15       The claim fails. First, the evidence was never suppressed by the prosecution.  It was

16  known that the initial transcript was prepared by an outside company, and defense counsel had

17  professed objections to it.  (Doc. 11-6 at 32.)  The updated transcript was provided to defense

18  counsel at trial.  (Doc. 11-6 at 32.)

19       Second, Petitioner has not demonstrated that the updated transcript was false.  At most, he

20  points out that one transcriber's discernment of what was said may have varied slightly from what

21  another transcriber discerned.  There is no evidence that the updated transcript was in fact false.

22       Third, Petitioner fails to demonstrate any prejudice resulting from the allegedly altered

23  transcript.  The trial court noted defense counsel's hesitance in using the updated transcript and

24  stated it would caution the jury that the transcript was only for their convenience and that if there

25  were any discrepancies, they were to be guided by the actual audio recording. (Doc. 11-6 at 33.)

26  When the audio recording was played for the jury, the trial court gave the following admonition:

27          [The prosecution] is going to play the audio of the interview that was done by this
            witness and the defendant. You will receive a copy of a transcript of that
28          interview. The transcript is someone's best effort at transcribing what was heard

                                            14

> on the audio. If you believe - - and we are providing you a transcript for use in listening to the video. If you believe there's a discrepancy between the audio and the transcript, you are to be guided by the audio version, not the transcript.

(Doc. 11-6 at 138.)

Thus, the jury was well aware that the transcript was only the transcriber's best effort at discerning what was said, and it was for them to decide what was actually said by listening to the actual audio recording.

Moreover, the final transcript included Petitioner's hesitance in acknowledging that he burned the victim. (Doc. 11-2 at 37, 41.) It included his statement that he didn't actually think he was burning her. (Doc. 11-2 at 44.) The transcript also included Petitioner's statement that the officer was trying to put words in his mouth. (Doc. 11-2 at 41, 42.) In closing remarks, defense counsel highlighted the fact Petitioner had stated he didn't know he was actually burning her. (Doc. 11-6 at 256.) Defense counsel further pointed out that Petitioner "didn't have much chance to talk. . . . and "that the majority of it is [the officer] talking." (Doc. 11-6 at 257-58.) He argued that Petitioner was not permitted to tell the whole story and that he was cut off repeatedly. (Doc. 11-6 at 258.) Therefore, Petitioner fails to demonstrate that the allegedly altered transcript was prejudicial. The claim should be denied.

For the same reasons, Petitioner's subclaim that defense counsel rendered ineffective assistance must also fail. Strickland v. Washington, 466 U.S. 668, 687-88 (1984). As noted above, there is no evidence that the updated transcript was false. At most, it varied slightly based on the transcriber. Moreover, Petitioner cannot show that defense counsel's failure to object to the transcript resulted in prejudice. Id. at 694. The jury was advised that with respect to any variance between the transcription and the recording, the audio recording controlled. Defense counsel also highlighted the helpful portions of the transcript while urging the jury to discard the damaging admissions as the officer repeatedly cutting off Petitioner and suggesting facts never stated by Petitioner.

　　2.　　Ground Two

Petitioner next alleges defense counsel rendered ineffective assistance in several ways: by

1    wrongfully withholding the fact that she allowed the exhibits to be destroyed; by failing to ask a

2    single question of the only defense witness; by allowing the State to submit an altered

3    interrogation; by failing to interview any of the witnesses Petitioner asked her to, in particular,

4    JS's daughter, who would have testified how vindictive and dishonest JS is, and Petitioner's

5    sister, who would have testified that she had beaten up JS, not Petitioner; and, by failing to object

6    to false evidence that Petitioner burned the victim with a torch, and that Petitioner confessed to

7    the crime.

8                             a.        Legal Standard

9            Effective assistance of counsel is guaranteed by the Due Process Clause of the Fourteenth

10   Amendment.  Evitts v. Lucey, 469 U.S. 387, 391-405 (1985).  Claims of ineffective assistance of

11   counsel are reviewed according to Strickland's two-pronged test.  Strickland v. Washington, 466

12   U.S. 668, 687-88 (1984); Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir. 1989); United States v.

13   Birtle, 792 F.2d 846, 847 (9th Cir.1986); see also Penson v. Ohio, 488 U.S. 75 (1988) (holding

14   that where a defendant has been actually or constructively denied the assistance of counsel

15   altogether, the Strickland standard does not apply and prejudice is presumed; the implication is

16   that Strickland does apply where counsel is present but ineffective).

17          To prevail, Petitioner must show two things.  First, he must establish that counsel's

18   deficient performance fell below an objective standard of reasonableness under prevailing

19   professional norms.  Strickland, 466 U.S. at 687-88.  Second, Petitioner must establish that he

20   suffered prejudice in that there was a reasonable probability that, but for counsel's unprofessional

21   errors, he would have prevailed at trial. Id. at 694. A "reasonable probability" is a probability

22   sufficient to undermine confidence in the outcome of the trial. Id. The relevant inquiry is not what

23   counsel could have done; rather, it is whether the choices made by counsel were reasonable.

24   Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th Cir. 1998).

25          With the passage of the AEDPA, habeas relief may only be granted if the state-court

26   decision unreasonably applied this general Strickland standard for ineffective assistance.

27   Knowles v. Mirzayance, 556 U.S. 111, 122 (2009).  Accordingly, the question "is not whether a

28   federal court believes the state court's determination under the Strickland standard "was incorrect

                                                    16

1    but whether that determination was unreasonable–a substantially higher threshold."  <u>Schriro v.</u>

2    <u>Landrigan</u>, 550 U.S. 465, 473 (2007); <u>Knowles</u>, 556 U.S. at 123.  In effect, the AEDPA standard

3    is "doubly deferential" because it requires that it be shown not only that the state court

4    determination was erroneous, but also that it was objectively unreasonable.  <u>Yarborough v.</u>

5    <u>Gentry</u>, 540 U.S. 1, 5 (2003).  Moreover, because the <u>Strickland</u> standard is a general standard, a

6    state court has even more latitude to reasonably determine that a defendant has not satisfied that

7    standard.  <u>See</u> <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664 (2004) ("[E]valuating whether a rule

8    application was unreasonable requires considering the rule's specificity.  The more general the

9    rule, the more leeway courts have in reaching outcomes in case-by-case determinations.")

10                              b.      Analysis

11          Petitioner first faults counsel for allegedly wrongfully withholding the fact that she

12   allowed the exhibits to be destroyed.  There is no evidence that counsel knowingly withheld this

13   information from Petitioner, and Petitioner cannot demonstrate any prejudice resulting therefrom.

14   As discussed above, Petitioner fails to demonstrate that the exhibits or photographs would have

15   changed the outcome had he possessed them subsequent to the appeal.

16          Petitioner also contends that defense counsel was ineffective in failing to ask a single

17   question of the only defense witness.  The claim is unsupported and conclusory.  Petitioner does

18   not identify the witness, the questions counsel should have asked, and how it would have altered

19   the outcome of the case.

20          Petitioner alleges defense counsel was ineffective in permitting the State to submit an

21   altered interrogation.  As previously discussed, defense counsel raised concerns about the

22   transcript to the court, and the court responded that it would, and in fact did, admonish the jury

23   that the transcript was only a best guess by a transcriber as to what was said, and that the jury was

24   to be guided by the actual audio recording rather than the transcript.  Petitioner fails to show what

25   more counsel could have done, or how the outcome would have been different.

26          Petitioner next claims that counsel failed to interview any of the witnesses he requested,

27   specifically, JS's daughter, who would have testified how vindictive and dishonest JS is, and

28   Petitioner's sister, who would have testified that she, not Petitioner had beaten up JS.  Petitioner

                                          17

1  does not present any evidence to which the witnesses would have testified, what the testimony

2  would have been, and how the testimony would have affected the outcome in this case.  Without

3  such proof, Petitioner cannot demonstrate that he was prejudiced by counsel's failure to call the

4  witnesses.  See United States v. Harden, 846 F.2d 1229, 1231-32 (9th Cir. 1988) (no claim for

5  ineffective  assistance of counsel for a failure to call a witness where no evidence witness would

6  testify); United States v. Berry, 814 F.2d 1406, 1409 (9th Cir. 1987) (ineffective assistance of

7  counsel for a failure to call witnesses fails when there is no indication what witnesses would have

8  testified to or how their testimony may have changed outcome of hearing).

9        Petitioner next claims counsel failed to object to false evidence that Petitioner burned the

10  victim with a torch, and that Petitioner confessed to the crime.  The claims are frivolous.  The

11  photographs and scarring were showed to the jury, and the audio recording of the confession was

12  played to the jury.  Petitioner's contention that the evidence was false was demonstrably refuted

13  by the jury's findings.

14        In sum, Petitioner fails to show that the state court rejection of his claims were

15  unreasonable applications of Strickland.  The claim of ineffective assistance of counsel should be

16  denied.

17        3.     Ground Three

18        Petitioner next contends that his appellate counsel rendered ineffective assistance by filing

19  a Wende[3] brief rather than pursuing the claims now raised by Petitioner.

20             a.     Legal Standard

21        A habeas claim alleging appellate counsel was ineffective is evaluated under Strickland.

22  See Williams v. Taylor, 529 U.S. at 390-391.  To establish ineffective assistance of counsel,

23  Petitioner must prove: (1) counsel's representation fell below an objective standard of

24  reasonableness under prevailing professional norms, and (2) there is a reasonable probability that,

25  but for counsel's errors, the result of the proceeding would have been different.  Strickland v.

26  Washington, 466 U.S. 668, 687-694, 697 (1984).  As the high court has observed, appellate

27  _____

28  [3] People v. Wende, 25 Cal.3d 436, 158 Cal.Rptr. 839, 600 P.2d 1071 (1979).

18

1  counsel performs properly and competently when he or she exercises discretion and presents only

2  the strongest claims instead of every conceivable claim.  Jones v. Barnes, 463 U.S. 745, 752

3  (1983); Smith v. Murray, 477 U.S. 527, 536 (1986). "Effective appellate counsel should not raise

4  every nonfrivolous argument on appeal, but rather only those arguments most likely to succeed."

5  Davila v. Davis, 137 S. Ct. 2058, 2067 (2017). "In many instances, appellate counsel will fail to

6  raise an issue because she foresees little or no likelihood of success on that issue; indeed, the

7  weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate

8  advocacy." Miller v. Keeney, 882 F.2d 1428, 1434 (9th Cir. 1989). The relevant inquiry is not

9  what counsel could have done; rather, it is whether the choices made by counsel were reasonable.

10  Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th Cir. 1998).

11         In People v. Wende, the California Supreme Court established a constitutionally sufficient

12  procedure by which appellate counsel may inform the court of the nature of an appeal and decline

13  to brief issues judged to be frivolous.  Smith v. Robbins, 528 U.S. 259, 265 (2000).  Appellate

14  counsel's decision to file a Wende brief is reviewed under Strickland.  Smith, 528 U.S. at 285.

15  Even if petitioner could demonstrate his appellate attorney acted unreasonably, he must still show

16  prejudice.  Smith, at 285-286. Habeas relief for ineffective assistance of counsel may only be

17  granted if the state-court decision unreasonably applied the Strickland standard.  Knowles v.

18  Mirzayance, 556 U.S. 111, 122 (2009).

19                   b.     Analysis

20         Petitioner fails to demonstrate prejudice.  As previously discussed, there were no

21  meritorious issues that appellate counsel failed to raise.  See Jones v. Barnes, 463 U.S. at 751-52

22  (appellate counsel does not have an obligation to raise every nonfrivolous argument); Miller v.

23  Keeney, 882 F.2d at 1434-35 (appellate counsel's failure to raise a weak issue did not constitute

24  ineffective counsel); see also Moorman v. Ryan, 628 F.3d 1102, 1107 (9th Cir. 2010) ("If trial

25  counsel's performance was not objectively unreasonable or did not prejudice [petitioner], then

26  appellate counsel did not act unreasonably in failing to raise a meritless claim of ineffective

27  assistance of counsel, and [petitioner] was not prejudiced by appellate counsel's omission");

28  Wildman v. Johnson, 261 F.3d 832, 840 (9th Cir. 2001) ("[petitioner] cannot sustain his claim for

1  ineffective assistance of appellate counsel because the issues he raises are without merit");

2  Featherstone v. Estelle, 948 F.2d 1497, 1507 (9th Cir. 1991) (where trial counsel's performance

3  did not fall below Strickland standard, claim that appellate counsel was ineffective for failing to

4  raise ineffective assistance of trial counsel on appeal must fail).  Thus, the claim fails.

5          4.      Ground Six[4]

6          In his final claim for relief, Petitioner alleges that the prosecutor committed misconduct

7  by introducing an altered transcript of the audio recording of Petitioner's interview.  He further

8  claims the prosecutor permitted the victim to knowingly testify falsely.

9               a.      Legal Standard

10          A petitioner is entitled to habeas corpus relief if the prosecutor's misconduct "so infected

11  the trial with unfairness as to make the resulting conviction a denial of due process."  Donnelly v.

12  DeChristoforo, 416 U.S. 637, 643 (1974).  To constitute a due process violation, the prosecutorial

13  misconduct must be "of sufficient significance to result in the denial of the defendant's right to a

14  fair trial."  Greer v. Miller, 485 U.S. 756, 765 (1987) (quoting United States v. Bagley, 473 U.S.

15  667 (1985)).  Any claim of prosecutorial misconduct must be reviewed within the context of the

16  entire trial.  Id. at 765-66; United States v. Weitzenhoff, 35 F.3d 1275, 1291 (9th Cir. 1994).  The

17  Court must keep in mind that "[t]he touchstone of due process analysis in cases of alleged

18  prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor" and "the

19  aim of due process is not punishment of society for the misdeeds of the prosecutor but avoidance

20  of an unfair trial to the accused."  Smith v. Phillips, 455 U.S. 209, 219 (1982).  If prosecutorial

21  misconduct is established, and it was constitutional error, the error must be evaluated pursuant to

22  the harmless error test set forth in Brecht v. Abrahamson, 507 U.S. 619 (1993).  See Thompson,

23  74 F.3d at 1577 (Only if constitutional error is established "would we have to decide whether the

24  constitutional error was harmless.").

25               b.      Analysis

26          Petitioner fails to show that the prosecutor committed any misconduct, let alone

27  _____

28  [4] Grounds Four and Five concerning the transcript and exhibits were previously discussed and rejected within Ground One, supra.

20

misconduct of constitutional magnitude.  There is no evidence that the prosecutor intentionally altered the transcript of the audio hearing.  The jury was advised that the transcript was only a best guess by a transcriber as to what was said.  There is also no reasonable probability that the transcript was in any way prejudicial.  The audio recording of the interview was played to the jury.  The transcript was provided only for convenience.  If the jury believed something was said other than what was provided in the transcript, the jury was advised that the audio recording controlled.  Petitioner fails to show that the state court rejection of the claim was objectively unreasonable.

There is also no support for the contention that the prosecutor permitted the victim to testify falsely.  Petitioner points out various inconsistencies and contradictions between the victim's earlier statements as compared to her trial testimony.  There is no evidence that the prosecutor knowingly elicited false testimony or knowingly misrepresented the victim's testimony.  The victim's varying and inconsistent statements were thoroughly cross-examined by defense counsel.  (Doc. 11-6 at 100-114.)  Defense counsel also used those inconsistencies in attacking the victim's credibility during closing remarks.  (Doc. 11-6 at 253-260.)  Ultimately, the victim's credibility was a determination for the jury to make.  Petitioner has not shown the prosecutor committed misconduct and the claim fails.

## IV.    RECOMMENDATION

For the foregoing reasons, the Court RECOMMENDS that the Petition for Writ of Habeas Corpus be DENIED with prejudice on the merits.

This Findings and Recommendation is submitted to the United States District Court Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  Within thirty (30) days after being served with a copy of this Findings and Recommendation, any party may file written objections with the Court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the Objections shall be served and filed within fourteen (14) court days (plus three days if served by mail) after service of the Objections.  The Court will then review the Magistrate

21

Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the Order of the District Court. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   **March 6, 2023**                                 /s/ *Sheila K. Oberto*
                                                          UNITED STATES MAGISTRATE JUDGE